We'll call the first of our three cases that we made this morning, number 13-1879, Griswold et al. v. Coventry First LLC et al. Mr. Shanmugam, and do you go by Mr. or Professor Mann? Take what I can get. All right. Well, thank you, Judge Ambrow and good morning. I'm Ken Shanmugam of Williams & Connolly for the Coventry Appellants, and with the Court's leave, I'd like to reserve four minutes for rebuttal. Fine. No problem at all. May it please the Court. The District Court erred when it permitted plaintiff's claims in this case to go forward for two reasons. First, plaintiffs lack standing to pursue the claims because those claims belong to the trust that actually sold the life insurance policy to Coventry. Now, the trust didn't exist anymore, did it? That is correct. The trust terminated upon the completion of the proceedings. But in our view, that in no way alters the appropriate standing analysis here. Because? Because we believe that the principle that a trust can act only through its trustee remains governing, and the question then becomes whether there is any applicable exception to that principle that would allow the beneficiary to sue under these circumstances. Plaintiffs have identified no such exception. They point to the exceptions that apply in circumstances in which, for instance, there is present interference with trust property that is in the hands of the beneficiary. They point to the restatement provision that applies where the office of trustee is vacant, and they point to cases involving the situation in which the trustee transfers some property to a third party in breach of trust. But if the trust, if I'm a beneficiary of the trust and the trust no longer exists, you mean I can't assert the rights that or the harm that happened to the trust when it did exist? No. And one would expect, Judge Ambrose, that if there were such a principle of trust law, that it would be reflected either in the provisions of the restatement or in Georgia trust law. And, again, plaintiffs cite not a single case of which I'm aware that involves the circumstance of a terminated trust. So who does this? It may very well be that no one has the ability to bring suit at the present day. And as we point out in our brief, even if the trustee has the ability to bring suit after the termination of the trust, and I would note that that issue is a little bit uncertain as a matter of Georgia law. We've not identified any cases pointing in either direction. But even assuming that the trustee had that ability for some period of time after the termination of the trust, the claims now would be entirely time barred. And as we note, the beneficiary does have a potential remedy. The beneficiary has the ability to pursue claims against the trustee. And, indeed, here Mr. Griswold at least initiated an action against the trustee. He filed a precipi that named the trustee as a defendant as early as April of 2010, but nevertheless failed to prosecute that action further. And so to the extent that the beneficiary has a remedy in these circumstances. The trustee is no longer a defendant, is it? The trustee was named as a defendant in the precipi, and there doesn't appear to have been any responsive precipi from the trustee or any notice of non-prosecution. And that was in the Pennsylvania State Court proceeding that was initiated in April of 2010. Yeah, because what I'm seeing here in terms of the defendants, I don't see the trustee. Yes, the trustee was never named as a defendant in this proceeding. So that was a separate precipi that was filed in state court. There was a notice of non-prosecution as against these defendants, and then this lawsuit was subsequently commenced. So my point is simply that the trustee is not a defendant here. Right. Judge. Of course. So your view is that neither Griswold, LLP, or Griswold have either constitutional or prudential standing? Our argument about constitutional standing, Judge Greenaway, pertains only to the partnership. The discussion that we've been having pertains to the issue of prudential standing. And again, on that issue, our submission is quite simple. I think it's quite clear and really undisputed in this litigation that it is appropriate to look to Georgia trust law for purposes of determining who has the right to sue, which is, after all, at the core of the prudential standing inquiry. And our submission is really quite simple. The plaintiffs point to no authority under Georgia law that would permit a beneficiary to sue under these circumstances. Now, of course, Mr. Griswold himself is not even a beneficiary here. He stands at yet another further step of remove. But we would respectfully submit that on this question of who can sue, the analysis is effectively the same as to both plaintiffs. And with regard to the partnership, we have the further argument about Article III standing, which depends on the simple proposition that the partnership is no longer in existence, or at least, to be more precise, that the partnership as it existed at the relevant time is no longer in existence. And for that reason, the partnership lacks Article III standing as well. Now, just to get all of our arguments on the table, of course, we also argue in the alternative that even if this court holds that the plaintiffs here have standing, that the claims in this case should nevertheless be remitted to arbitration. And that's for the simple reason that the – Before you move on to that, can you go back to an issue that's troubling me, is why we even have jurisdiction over the order denying your motion to dismiss? Sure. Well, first – Why can't that be reviewed in due course? First of all, this court plainly has jurisdiction over at least some portion of this appeal because – The arbitration portion. Yes, that's correct, and that's one of the provisions of the FAA. Fine. And what about the standing? And on that issue, we would respectfully submit that this court's decision in the Majestic Star Casino case, which we cite in our briefs, stands for the proposition that the court has the authority, and indeed, in our view, also the obligation to consider standing. I would respectfully submit that the only issue that is perhaps a little bit uncertain in the way – Wait a minute. This would be – it's mandatory that we exercise pendant jurisdiction? It would be that this court has an obligation to consider standing because, in the words of the Majestic Star Casino case, it involves judicially self-imposed limits on the exercise of federal jurisdiction. And so even leaving aside the question of whether the standing – This is sort of the next case. I mean, you've got an 11th Circuit case and a 7th Circuit case, I think, that go the other way. Well, those are cases in which courts have refused to exercise the authority to consider jurisdictional issues on interlocutory appeals. And again, of course, Majestic Star Casino – Which goes back to Judge Hardiman's question. I mean, it's front and center. The answer to that question, I think, is that Majestic Star Casino stands for the proposition that this court does have the authority to consider standing. And in Majestic Star Casino, which was an interlocutory appeal under, essentially, the bankruptcy equivalent of Section 1292, the court proceeded to consider not only a question of standing, but a question of prudential standing, a question of third-party standing. I think the open question, Judge Hardiman, is whether this court would be obligated to consider standing first if the court agreed with us that these claims should be submitted to arbitration. I would note that in Majestic Star Casino, the court seemed to be operating on the assumption that it had the obligation to consider standing first. But here, unlike there, one could make the argument that the question of whether or not these claims should be submitted to arbitration is a threshold question to the extent that it is also a threshold question. This court might have the authority to choose which of those two questions to answer. I was on the panel in Majestic Star, and I thought that we dealt with constitutional standing initially. I mean, not prudential. The court talked about both constitutional and prudential standing, but I think when you look at the principle that the court actually applied, which was the principle of third-party standing, and you'll remember it was the question of whether or not the subsidiary had the ability to challenge the revocation of S Corporation status, I think the court was applying the principle of third-party standing. And that, I think, flows from the Worth v. Selden principle of prudential standing. Let's come back. Are we required to examine prudential standing here? We think that you would be required to consider it at a minimum before affirming what the district court did. In other words, what we think would be plainly improper would be for this court to say, we're going to affirm what the district court said on arbitrability and just assume the existence of jurisdiction at this stage. We don't think that this court can do that, really under the sort of foundational principle of cases such as Steele Company. We think that what this court could do is, if this court thinks that this dispute should be remitted to arbitration, I think it is at least arguable under the principle of the Sinachem case, with which, Judge Ambrose, I know that you're familiar. With regard to threshold questions, a court has some degree of discretion to decide which of those questions to consider first. Sinachem was an admiralty case that somebody didn't want to have to write, so I ended up writing it. Turns out it was not on that panel. It didn't turn out to be an admiralty case in the end. No good deed goes unpunished, I suppose.  I think what's important to bear is that, even with regard to certain non-jurisdictional threshold issues, a court has the ability to consider those issues before jurisdictional questions. In the words of the Supreme Court, where you have a determination that the merits should be adjudicated elsewhere, the court has the ability to make that determination before a jurisdictional question. And I think, at least arguably, the question of whether a claim should be decided in court or before an arbitrator would fall into that category. I see that my time is relatively short. We're going to continue on here. A pendant appellate jurisdiction is appropriate where you have an inextricably intertwined issue between standing and arbitrability. How are they inextricably intertwined here? So, Judge Amber, I just want to be quite clear. I think there are two potential bases on which a court could assert appellate jurisdiction over a jurisdictional issue on an interlocutory appeal such as this one. I think, quite frankly, the better view, and the view that I think is embodied in Majestic Star Casino, is that a court simply has an obligation to do that, regardless of the degree of relationship between the jurisdictional issue and the issues that gave rise to the interlocutory appeal. And that really is under the reasoning of cases such as Steel Company, that a court has no authority to act unless it is properly asserting jurisdiction. If this court were to disagree with that principle, I think it would, first of all, I think it would have to essentially overrule Majestic Star Casino, which, of course, the panel cannot do. But even if the court were to think that that was... We have to overrule Majestic Star Casino? What was the analysis there as to why there was standing? Was that a bankruptcy case? It was a bankruptcy case. And the trustee in bankruptcy has a very different role than what you have here. The trustee steps into the shoes. Well, but the question in Majestic Star Casino was whether... There was a substantive question of whether or not the debtor's Q-sub status was property of the bankruptcy estate. That was the question that went up in a Section 158 appeal. And the court, despite the fact that the parties had not litigated jurisdiction either before the lower courts or even before this court, said we have an obligation to consider questions of standing. There is a question of third party standing here. And that question, while wrapped up in the merits of this underlying, very complicated question of whether or not the Q-sub status was part of the bankruptcy estate, is one that we have to consider at the threshold. And so what the court did is... That's once there's jurisdiction, though. Aren't you putting the cart before the horse? There's no question, Judge, though, that there is jurisdiction over the district court's order here. The question then becomes whether this court has the ability to go beyond considering the question of arbitrability here and consider... That we agree is a final order. I'm just still questioning whether the denial of the motion to dismiss that that's final order. I mean, obviously, if we were to assert pendant appellate jurisdiction to the But isn't that the hook that you need to hang on? Well, it was all disposed of in a single order. This court has appellate jurisdiction to review that order. And the question, in our view, is what does this court have the authority to consider? And, again, I think if you take a look at the relevant reasoning of the Majestic Star Casino case, and this is at pages 747 to 749, the court turns to the issue of standing first because it involves, quote, limits on the exercise of federal jurisdiction. And I think that's entirely consistent with the broader principle embodied in cases such as Steel Company, which, of course, is the Supreme Court case that stands for the proposition that district courts can't simply assume the existence of jurisdiction. When a district court notices a jurisdictional defect, it has an obligation to consider and resolve that defect, even when the parties don't do so themselves. Now, of course, this case doesn't implicate any of the complexities about whether or not, for instance, prudential standing is non-waivable or non-waivable because the prudential standing objection has been preserved all along. This case simply presents the question of whether or not this court has not only the authority but really the obligation to consider a jurisdictional defect. And we respectfully submit. Let's go on to the arbitration provision. Isn't it true that the – first of all, what is the status of the New York investigation that's going on? I believe that the New York investigation is concluded. And what did it conclude? I believe that it was concluded pursuant to a settlement. As to New York residents? Yes. I believe that that's correct. So that's no longer on the table here. And, of course, were there findings made by the commission or the investigatory body? I don't recall whether there were specific findings that were made. What I do recall is that Coventry vigorously disputed the allegations that were made in the New York Attorney General's complaint, and those are the allegations that are reflected in the complaint. Well, based on the complaint that's currently before us, the arbitration – I mean, the complaint seemed to claim that there were harms that were – happened to the plaintiffs as a result of what happened in the appointment agreement. Correct? Yes. Well, the primary harms here are violations of the purchase agreement. Now, it is true that Mr. Griswold attempts to establish individual entry. Well, the amended complaint doesn't even mention the purchase agreement, does it? The amended complaint deletes all the references to the purchase agreement. But our fundamental submission on the question of arbitrability is that the claims because every single claim in this case is a claim that depends on the purchase agreement and the terms of the purchase agreement for the claim injury. Why weren't some of the claims preceding to that agreement? Didn't the appointment agreement precede the purchase agreement? The appointment agreement did precede the purchase agreement in this case. So that is to say Mid-Atlantic is appointed as the agent for the trust. Mid-Atlantic subsequently enters into the agreement. And the commission was set in the appointment agreement? The commission was certainly not set in the appointment agreement. I think it's important to realize that the appointment agreement is the appointment of Mid-Atlantic as the agent of the trust to attempt to effectuate a sale of the policy. And McGarry, the broker who allegedly received the secret commission, doesn't come onto the scene until much later in the proceedings. And, indeed, the agreement fixing his commission actually postdates the purchase agreement in this case. And what is that agreement? That is the agreement that provides for his receiving the commission of $145,000. And who were the parties to that? And the parties to that were the fee schedule that contains that is at Joint Appendix 349. No, but what was the agreement that sets that and who were the parties? And that's Coventry First and the broker. Okay, so that's Coventry, but that's not the any of the plaintiffs, it's not the trust, and it's not the LLP. That is correct. But the claims in this case are that the commission that the broker received was too high, and that as a result of that fact, the amount that the trust received in the sale was too low. As you say, the claim is that he got paid too much so they got too little. Yes, that is correct. And I think that the best evidence of the centrality of the purchase agreement, Judge Ambrose, comes from the initial version of the complaint in this case, which incorporated the purchase agreement and contained numerous allegations pertaining to the purchase agreement. Now, when we raised the objection that these claims were subject to the arbitration provision of the purchase agreement, it was at that point, perhaps not completely coincidentally, that all of the references to the purchase agreement were deleted from this amended complaint. Right. But if the claims were that Coventry was improperly colluding with brokers such as McCary and rigging the bidding process, aren't those claims entirely independent of the purchase agreement? No, I don't think that they are because, again, the claimed injury with regard to both the plaintiff here and with regard to the class members here, and I'll turn to the issue of the role of the class members presently, is that the individuals who were allegedly harmed received too little as a result of this alleged misconduct. And I would respectfully submit that that comfortably falls within the scope of what is, even by the standards of arbitration provisions, an exceptionally broad provision, particularly when you take into account the presumption in favor of arbitration that is embodied in the so-called touch matters standard, namely the standard that disputes are arbitrated as long as a touch matter is implied by the relevant arbitration provision. And I would just note the language of the arbitration provision, which requires arbitration of all disputes and controversies of every kind in nature between the parties arising out of or in. Well, between the parties, that doesn't help you. Well, between the parties doesn't hurt us, Judge Ambrose, and that's for the simple reason, the mere fact that that language is included doesn't somehow abrogate the background principles of law that determine the circumstances under which non-signatories can be found. I mean, just as a general rule, you and I have an agreement and we have an arbitration that's between us. How does that necessarily, as a general matter, bind Hardiman and Greenaway? As a general matter, the easiest way to reach the conclusion that it binds Judges Hardiman and Greenaway is that if Judges Hardiman and Greenaway are seeking to stand in your shoes for purposes of asserting claims that are properly yours, it's settled not only in this circuit but elsewhere. But that's kind of the paradigmatic situation. That's an estoppel argument, right? Well, it's actually, I think, a threshold question even before you get to equitable estoppel. And we cite, for example, the Hazen Company case from this court, which Judge Ambrose was a bankruptcy case in which this court said, a bankruptcy trustee stands in the shoes of the debtor and, therefore, can be bound by an arbitration provision to which the bankruptcy trustee was obviously not a part of. Because of the peculiar nature of bankruptcy. Well, it's a principle of law that is no different from the principle of law that where an individual is attempting to assert claims that are the claims of a trust, that individual is seeking to stand in the shoes of the trust. And you don't have to take my word for it. There are allegations in the complaint where the plaintiffs say in so many words that that is precisely what they're attempting to do here. But even if they had not said that, I think if you take a look at each of the eight claims in this complaint, and we walk through them at page 40 of our brief in some detail, you'll see that each of those claims, claims and injury, that is an injury to the trust in its capacity as the seller of the life insurance policy. And that is all that is required, we would respectfully submit, to bind the plaintiffs in this case to arbitration. Was the secret McGarry agreement available at the time of the trust dissolution? Well, the claim here is that there was a secret. I thought that was a yes or no. Well, let me sort of, you know. We can go forward, but just answer that. The secret. And I know that's pejorative. They call it the secret McGarry agreement. Was that agreement available at the time of the trust dissolution? Well, to the extent that they claim that there was a producer agreement between Coventry First and Mr. McGarry,  and we are not aware of such an agreement. All they have come forward with is the fee schedule between Coventry First and McGarry. And that is a document that would have been available to the trust if the trust had asked for it, as the May declaration makes clear. So the answer is yes, it existed before. Well, the fee schedule plainly existed before. The claim in this case, or at least the implication, is that the trust did not have that fee schedule. But the only evidence in the record is a declaration from Mr. May, a Coventry employee, indicating that if the trust, as the seller of the policy, had asked for the fee schedule, it would have gotten accomplished. Sure, but you argue the trust should have known. It was on some kind of inquiry notice. But why in the world would the trust be charged with such inquiry notice? Was the trust to presume that there was some sort of sub rosa double dealing here between Coventry and McGarry? That seems rather implausible. Our point, Judge Hardiman, is simply that the trust could very well have had an obligation to confirm the amount of the commission. And if it had asked, it would have obtained this fee schedule. And again, our submission with regard to the producer agreement is simply that this record does not contain a copy of a producer agreement between Coventry First and the broker here. All that is reproduced in the record is a copy of an allegedly representative producer agreement involving Coventry. But again, our principle submission here with regard to arbitrability is simply, first, that the disputes here comfortably fall within the scope of the very broad language of the arbitration provision. And second, that under the principle that a non-signatory who seeks to stand in the shoes of the signatory is bound, the plaintiffs here should be bound. You're relying there, the bankruptcy case, I guess, is the Merrill Lynch case from 89. Yes, that is correct. But do you have any analogous principle that a trust beneficiary should be bound to the trust? Well, I think it is precisely because what the beneficiary is attempting to do, and this relates back to the first part of the argument this morning, is to assert the claims of the trust. What the beneficiary is attempting to do, based on its amended complaint, is deal with what it alleges to be a fraud pursuant to the appointment agreement and also the agreement between Coventry and McGarry that preexisted the purchase agreement. Well, I just want to be very clear about what this appointment agreement is because I think it's understandably a little bit confusing. The appointment agreement was the hook that the district court used to conclude erroneously in our view that Mr. Griswold had standing in his individual capacity. And that is the agreement that did nothing more, Judge Ambrose, than appoint Mid-Atlantic as the agent of the trust to shop the policy around. And that was an agreement that was entered into well before the actual sale was completed. Now, the plaintiff's point to that. If you just come. Is there any extension that you know of, of the principle of Merrill Lynch, which dealt with bankruptcy to binding a beneficiary of a trust? I mean, you're saying, yeah, it's our alter ego, but what supports that? What cases support that? I don't think that this court has had a case, and I'm not aware of a case standing here, that specifically involves a trust beneficiary. But what I would say is this principle, that a party that seeks to stand in the shoes of a signatory is bound, is a widely accepted principle. It is one of the categories. That segues, I think, to the estoppel argument, that somehow, if it does, how does a non-signatory who doesn't claim to benefit from the purchase agreement now have to arbitrate claims that you claim somehow are arising under the purchase agreement? Well, even assuming that you thought that there was some way around the principle of binding a non-signatory here, we would still be left with our arguments about equitable estoppel. And I would respectfully submit that this is a context in which, at a minimum, the plaintiffs reaped the benefits of the agreement in question, because after all, they were indirectly, by virtue of their status as the beneficiary and a partner in the beneficiary, the recipients of the revenues from the sale of the policy. And so under the principle articulated by this case, and again, it's a principle that I think is widely accepted, the plaintiffs in this case, having benefited from the agreements, take the bidder with the suite and here should be bound by the arbitration provision. Or you could say they reaped the detriments of the secret McGarry agreement. Well, but that is just another way of saying, Judge Hardiman, I think that their injury flows from the transaction that was governed by the purchase agreement. And I thought INVISTA was pretty skeptical of non-signatories compelling other non-signatories to participate in arbitration. We cite INVISTA here simply for the principle, which, again, I think is a well-established principle, that a party that seeks to reap the benefits of an agreement to which it was a non-signatory can be bound under principles of equitable estoppel. Now, it is true that Chief Judge McKee, in the opinion for the court in that case, went on to say, well, there's something a little bit unusual about this case, in that it is a non-signatory case. But the court proceeded, of course, not to consider whether that would be appropriate, because the court went on to say that the appeal was moot. Now, we cite a number of cases in our brief, albeit no cases from this court, that involve precisely that situation, namely a non-signatory on non-signatory. Now, I would note, with regard to the defendant's side of this, because I think that that is important to keep in mind, that we have one defendant here who plainly was a signatory, Coventry First. And so at a minimum, if the court felt uncomfortable about remitting the entirety of this dispute to arbitration for that reason, it could order the dispute against Coventry First to be sent to arbitration, and the district court, in its discretion, could stay the claims against the other defendants. But with regard to the defendant's side, I think our submission is actually equally straightforward here. The plaintiffs allege that the defendants were acting as alter egos of Coventry First. And the relevant allegations in the complaint, with regard to the other defendants, are relatively spare, but they're contained at paragraphs 44 to 47 of the amended complaint. And under those circumstances, I think it's quite clear, and plaintiffs really don't dispute the legal proposition, that where a non-signatory is alleged to be the alter ego of a signatory, it can be bound. And I would just add one other. Before you do that, if I may, I just want to pin this down. Is there any principle analogous to Merrill Lynch that says that trust when, in this case, they don't claim in their amended complaint to be seeking any benefits given by the purchase agreement? So I think my response to that is twofold, Judge Ambrose. First of all, that what we're talking about here is the generally applicable principle, that where a non-signatory seeks to stand in the shoes of a signatory, the non-signatory is bound. And I would note, parenthetically, that that is a principle that is not at all in their brief. And perhaps Mr. Mann will get up here and dispute it at oral argument, but it is certainly not disputed in the briefing. Second, even assuming that this Court were to permit plaintiffs to engage in precisely this sort of artful pleading that courts have consistently held as impermissible when you're talking about the application of an arbitration provision, what we're left with here are claims that nevertheless depend on the purchase agreement both for their existence and for the claimed damages. And so even if there are not references to the purchase agreement in the relevant claims here, it is quite clear that each of those claims asserts an injury that is based on the sale of the policy by the trust for an improperly low price. And for that reason, we think that that principle is triggered here. All right. I want to say just one word on the issue of class arbitration. We'll leave you to do that on rebuttal because I have some questions for Professor Mann. I will happily do that. Thank you, Judge. That would give you a good entree. Whenever you're ready. With the Court's indulgence, I think I might talk about three factual clarifications to the record. You better state your name and who you represent. Ronald Mann for the Appellees, the Griswold Partnership and Griswold, the individual. I'd like to address three factual matters from the record before I get into my argument just to clarify some things. The first one is with respect to the settlement of the New York investigation about which Chazambra inquired. The complaint alleges that the consent decree required Coventry to pay $12 million, and that's in paragraph 135 of the complaint at page 204. I think that the Court's obligated to assume that that's true because it's much to dismiss, and I think that if you search on the Internet, you can take public notice of some more details that you might discover about the consent decree that are not actually in the record. The second thing is my learned colleague certainly didn't misstate, but I think said something I could say a little more clearly. The producer agreement which predates the agreement which predates the purchase contract set the commission that was paid for the sale, but what it didn't set is what we would call the kickback, which of course couldn't be set until after the sale. So there's, according to the allegations of the complaint, there's a commission that was paid under the standard agreement, and there's another payment that was made under the secret agreement. And then the third factual question, you asked whether the McGarry agreement was available to the trustee before the trust terminated. Well, it's arguably true that it existed. The complaint alleges such an agreement based on allegations about pattern and practice in the industry, but the plaintiffs do not yet have a copy of the agreement because we've had no discovery, and because it's a secret agreement, of course, part of it being secret is we have never seen it. And so the record doesn't have any reason to suggest the trustee has seen it either, the allegations are that it was secret, and we have not yet seen it today. So turning to the- Well, I don't know if it's secret or not, but you haven't seen it. Let me work backwards, if I may, and we'll start with arbitration, arbitrability, before we get on to questions of standing and whatnot. The provision on arbitrability reads, all disputes and controversies of every kind and nature between the parties, and we talked about that earlier, arising out of or in connection with this purchase agreement it is, including without limitation a host of things, must be arbitrated. Why isn't what was alleged here? Maybe it doesn't arise out of the purchase agreement, but, boy, isn't it in connection with the purchase agreement? I guess what I would say on that generally is, much of the appellant's argument is in the nature of, we can imagine a poorly drafted complaint that you would have written, that plainly would have been subject to arbitration, and your first complaint is pretty close to that kind of complaint, and they make this suggestion there's something sinister about the plaintiff getting a response from the defendant and filing an amended complaint. That's what happens in litigation all the time. Our clients filed a complaint. The defendant suggested what their objection was going to be. We filed an amended complaint that, you know. Well, the amended complaint seems like it was to take out the issues relating to the reliance on the purchase agreement, but. Well, I don't think there's anything sinister about writing an amended complaint that's designed to avoid dismissal. I think that's what people do all the time. I think the DuPont case is a good example in 2001, where the panel actually sort of pointed out, well, DuPont shouldn't have said this in their complaint and shouldn't have said this in the complaint. I mean, I think what's relevant is, does the complaint that's under adjudication of the district court, does that state causes of action that are subject to arbitration? And I think if you read the clause, there's two things about this particular clause. But what you've got here is this would seem to be an allowable bootstrap. If you have an amended complaint that states that, in effect, that because of this, quote, secret agreement, close quote, you got too little from what you otherwise should have gotten, and that relates or is in connection with a purchase agreement that was entered into, why isn't then the plaintiff subject to the arbitration provision of the purchase agreement, especially as Mr. Chemeghan says,  Okay. I think I can respond to that in three ways. Okay. The first one is, you're stating the complaint more the way that he would like to state it than the way it's actually alleged. Well, I'm stating the second complaint is different. But you've now got, you normally would say, you know what, that really relates back to the purchase agreement. And what would be his argument? The argument would be, it relates back, and we know, because the first complaint, all it really talked about was the purchase agreement. But the complaint in the second complaint is not, we got too much money under the purchase agreement. The complaint in the second amendment complaint in substance is, they have this overarching, wide-ranging, long-enduring conspiracy, the purpose of which is to corrupt the brokers that sell policies. And so our complaint is that, not that we didn't get out of the purchase agreement. We do not suggest there was any breach of the purchase agreement. We do not suggest the purchase agreement should be rescinded. What we suggest is that they corrupted McGarry. And the core of the allegations are that their corruption of McGarry and their corruption of the market for people like McGarry is actionable under federal law, under RICO and the antitrust laws, and under a variety of common law cause of action. That's the core of the complaint. And that was antecedent to the agreement. That happened long before. Our allegations are, which you might take as true, that this conspiracy has endured for many years in many jurisdictions. The allegation about the investigation in New York provides some reason to make that credible under sort of, I guess, the Iqbal versus Ashcroft standard. But that's the core of the complaint we chose to present. So that's the first thing, is I think if you look at the complaint that we presented, you'll see something different than what he artfully describes as a complaint that would have been easier to dismiss. You're essentially making broad claims, are you not? Yes. We think that they have. And they would be proved through what? Through testimony that the purchase agreement and other related disclosures did not disclose what should have been disclosed? Well, I think that the conspiracy is to corrupt the brokers. And so what we would do is we would prove that they have a pattern of setting up these relationships with brokers, setting up these agreements with brokers that they arranged not to have disclosed to people who are selling policies so that the people who sell policies will confront a marketplace in which they believe that a broker is working for them when, in fact, the broker is on the other side. Right. Now, that is a harm. In subsequent deals, the purchase agreements don't disclose and anything else that requires them to disclose, those disclosures weren't made when they should have been made. To be sure, those disclosures weren't made, but we have not alleged that they breached the contract by failing to disclose anything to us. That's not our claim. It's not that this contract was breached. Perhaps we could sue for that. But because we weren't a part of that contract, we thought that wasn't an apt suit to bring for the people that we have. We're not suing under the purchase agreement because we weren't parties to it. We're suing for the injuries that we suffered. Don't we have to focus on McGarry? You referred to the brokers in the plural and generically. I mean, as I read this, this is not a class action anymore. It might have been at one time, but this is not any longer. This is a dispute between these plaintiffs and these defendants. I guess what I would say is that remains to be seen. As you know, it's very hard, very hard these days to get a class action certified. No one is undertaking to have any discovery to suggest whether the allegations about this as a pattern of class-wide conduct are supportable. There's a lot of hurdles to go. All that's at issue today is not whether there's a class. It's the issue whether the entire complaint can be dismissed. No, but what is at issue is whether that issue was forfeited and opposing counsel has argued that you didn't meet that challenge in the district court, and I don't see anything to undermine that argument. So what do you have there to counter that argument? I don't believe that we responded on that basis. I think our principal response was that this case is not subject to arbitration at all. I don't think we addressed in detail whether it should be class or individual arbitration because we believed then as we believe now that we have strong arguments why it's not arbitrable. Starting off with the fact, which as Judge Ambrose notes, I mean something sounds wrong when you have a case where none of the plaintiffs signed the contract, several of the defendants weren't a part of the contract, and indeed none of the defendants, the record doesn't show that any of the defendants actually signed the contract because there's not a signed contract in the record. What we start with is if you focus on what the Supreme Court has said about the Federal Arbitration Act, the goal of that statute is not to say everything on the planet should be arbitrated. The goal of that statute is to say any time somebody signs a contract about arbitration, that contract is to be enforced. And the reason that the Supreme Court has had to act so vigorously is because state courts and some federal courts, but predominantly state courts have acted with hostility to arbitration, and because they've had hostility to arbitration, they have looked at a contract and said, well, we see that you contracted for that, but we can't stomach you making that contract so we want to enforce it. So the Discover case is a great example of that. That has nothing to do with the arguments here. We're not saying you should be pro-arbitration or against arbitration. We're saying you should look at the contract that people signed. And the beginning and the end of all of these cases and all of these principles of law in the cases is, what is the intent of the parties? And so the first question here is, did these people agree to arbitrate? And if we find that they did, then from your standpoint, the issue of individual versus class arbitration should be resolved by the arbitrator? If you find that these individuals agreed to arbitrate, you still have to get over the hurdle of whether or not the particular disputed issue here is a dispute subject to the scope of the clause, which we think for the reasons I've debated with Judge Ambrose for some time is at least a difficult question, if not one that's clearly in our favor. But if you get through all that, then the case is never going to be sent to an arbitrator. Our position on the class litigation is we haven't yet decided whether there's going to be a case. And if there's a case, then we can figure out whether it's going to be an individual case or a class case. Well, but I'm not sure how we can just postpone that decision because part of the dispute here involves who the actual parties are, who were the parties to the agreement, and who are the parties to this litigation. And my understanding is that neither Griswold LLP nor Mr. Griswold owned the policy when it was transferred to Coventry, correct? That's correct. So how could they possibly have standing to act on behalf of a class of such transferors? Well, if their claim is that the harm was to the market and to the people that were trying to transfer policies, obviously Mr. Griswold and the partnership were in that marketplace. Mr. Griswold owned a large share of the beneficiary of the policy. The beneficiary of the policy is the one who is most primarily harmed by collusion in the market for buying and selling policies. So we believe that – On the question of standing, let's go back to the very first question that was asked of the opposing counsel. Great. Wait a minute. Why aren't we – I mean, don't we have to, in effect, look at standing as a threshold issue of justice ability? So we don't have a strong view on the appellate jurisdiction question because I think we're strong on the merits, but we should address it for you. Where I would start with on the jurisdictional question is the premises is like many of the questions. The courts have said something along the lines of, it's not impossible to ever have pen and appellate jurisdiction, but it should be very, very rare. The Supreme Court's decision in Swinton is very hostile to this doctrine. They talk about multi-issue interlocutory appeal tickets. I think I can give you a couple of examples of things that you indisputably know what the right answers are that will show that the doctrine really shouldn't apply here. The first problem is I think when you look to Majestic Star, as Judge Ambrose Dallas knows, the basis of the appeal in that case is very different to the appeal at this case, which is why this case much more crisply raises the issue of pendant appellate jurisdiction than that one. That was an appeal under Section 158 of a bankruptcy proceeding. It wasn't a statute that said you can appeal arbitration but not the whole case. We have a case where you plainly have jurisdiction to consider whether the matter is arbitral. Congress thinks that should be appealed quickly for obvious reasons. So there's a statute about arbitration. The statute says nothing about standing. So if you look at the next question is do you have to consider the standing question because it's bound up with whether the court has jurisdiction of the case as a whole and you can't rule on any type of matter that comes before an interlocutory state without considering that. Well, that's obviously wrong. So you might look, for example, at you frequently get appeals under the Cohen Doctrine where someone would say there's no personal jurisdiction of the defendant and the district judge has erred in doing that. We're up here under Cohen and you can't make this case go because there's no jurisdiction in the district court. They have no power to do this. And your answer every time is going to be we don't care. We don't care. It's not relevant to us whether the district court does or does not have jurisdiction over the defendant because that's not an interlocutory appeal. You can appeal that at the end. Now, if the appellant is correct, before you decided that you'd have to look at the merits of the personal jurisdiction question because it's on a piece of paper that's before you and that's obviously not what you do. What's at issue here is you have jurisdiction because of arbitration. The standing question they've raised it because it's a meaty legal question that they eventually might be able to get you to overturn the decision on. But we think it's not inextricably intertwined. You could say this case isn't going to be arbitrated. They would go on and they would have a trial in which we would decide the merits of who the people are that hold the claims and they might win, we might win, and then you can decide whether the plaintiff's head's standing at the end. And I think that's plainly the way that this ordinarily would proceed. So I think the magistrate's... Even assuming you have a good argument under the very narrowness of the or questionableness of the dependent appellate jurisdiction doctrine, that process you just described is rather inefficient. Why? What is it about the record as it stands now that should give us pause in taking up that issue rather than doing it the inefficient way? Well, I'd say two things about it. One is it's a multi-issue intellectual appeal ticket, which is not what Congress wrote. Congress easily could have written a statute that says we think these arbitration cases should be pushed along, so this is just a nice arbitration. You can take the case up and decide all the issues in the case. And that's clearly not what they said. And the second thing is if your argument were true that it was appropriate for an appellate panel to consider interlocutory issues without regard to jurisdictional statutes because it's efficient, I think really frequently you would take jurisdiction over appeals on personal jurisdiction questions because those are frequently going to be dispositive of an entire case and you just don't do that because those can be reviewed at the end. In this particular case, I think it's important to see that the standing questions would be informed by a development of a factual record. And there's a lot of concern here about what the merits are of the claims, who has the claims. But this question of who has the claims is really are these valid claims. And so your concern is how can somebody who's not the trustee have this claim? Well, that's a defense on the merits which should be presented to the arbitrator. Now, I want to say one really important thing about what I thought was Judge Ambrose's first question, which is this discussion of – The first question that was asked of your opponent? Yes. I thought your first question, which my memory has degraded faster than yours, apparently. I thought your first question of the appellant was how can it possibly be the case after the trust is dissolved and is gone that the beneficiary can't bring a suit? And his answer is, well, if you look at the restatement, section 282, it says that you can sue if the trustee is vacant. Well, just know what it says. I encourage you to look at it, section 282, subsection 3. What it says is if there's not a trustee the beneficiary can sue. There's not a trustee here. And if you look at comment G and read it, it just couldn't be clear. That question I asked, I thought the question on standing was the preceded – I thought it was – Well, he's on record as saying maybe no one can bring the – maybe they win because nobody can bring the case. I think that's what I heard him say. That's what I heard him say. I'm going to say I don't think – I'm going to say to give you pause to think as a matter of trust law that when a trust dissolves, causes of action that are worth money just disappear. And if you look, you'll see that's not what happens. What happens, there's a Georgia statute that's cited in our brief. It's kind of hard to find because it's no longer enforced, but it's section 53.12.58 that says everything passes to the beneficiary when the trust dissolves. There's no dispute the trust dissolved here. There's no dispute everything passed the beneficiary. And I want to emphasize because there seems to be some confusion about this, what's important to us to pass the beneficiary is not the fact that somebody signed this contract. We don't care about this contract. What's important to us to pass to us is the proceeds of the policy, so that the contract has nothing to do with this. If there's anybody who has a right to complain, it would be the beneficiary. The trustee can't possibly complain because the trustee is gone because the trust is gone. But that actually leads to one of the key points that's made at the outset of your opponent's brief, opening brief. You claim that your clients have the benefit of standing to bring these claims because they're beneficiaries, and yet they do not have the duty to arbitrate because they weren't signatories to the actual purchase agreement. How can you have it both ways? I mean, that's in effect, as I understand the gist of what they're saying. Well, I think it's a brilliant way for them to frame the case, and so I think they've done a really good job to present that frame, an even better job to get you to observe it. Well, it's at the beginning of the brief, so it's kind of hard to miss. But I think that it is not a fair assessment of our case because our case is not that the beneficiary and the individual have a right to sue because they stand in the shoes of the party of the contract. Our claim is if I'm a beneficiary of an insurance policy, which matters a lot to me, or if I'm the owner of the beneficiary of the insurance policy, so I'm effectively the owner of the beneficiary of the policy myself in any Article III monetary term, I am harmed. I am harmed if there's people out there in the world who are rigging the market for insurance policies. That's bad for me, and I'm harmed by it, and it's a real-world harm that I can sue for. That's the basis of our complaint. But you have to concede, don't you, at least some relationship with the contract because but for the contract, the beneficiaries could never have been, from your perspective, snookered by this conspiracy. Absolutely. When this case goes to trial, the contract will be produced and will go into trial. So then how do you get away from their, you know, your adversaries are arguing, look, this is a pretty broad touch upon, you know, it's pretty broad. How do you get around that? Can I say three things? And I'd like one more point. I still have to make it in the amount of time. I haven't got to. The first thing is we're not alleging a breach of contract. I think if you go read through a lot of these cases, you're going to have trouble finding one where it's said to relate to a contract or non-signatory they don't allege a breach. Okay, we don't say the contract was breached. We don't care if the contract was breached. That's irrelevant to us. Okay, this is not a breach. You're the fraud and the inducement, are you? But for this alleged conspiracy, the contract's never entered into. But you'll notice. Isn't that the gist of your argument? No, the complaint doesn't even allege a claim for fraud and the inducement, if you'll notice. Our claim is not we were fraudulently induced into this and so the contract should be rescinded. I think that would depend much more on the agreement. I think the case that discusses this best is the second of the three. I'm moving forward. Is what? This is the second of the three. I'm moving forward. The Ford case from the Fifth Circuit. The Ford case from the Fifth Circuit is a case where a doctor is suing an HMO. Now, the doctor has a contract with the HMO that has an arbitration clause. And he doesn't say the contract was breached. He sues the HMO saying, you are saying all these false things about the way that your system works, and so sues him for false advertising in the Lanham Act. Now, he might ultimately lose. There's heaven standing for that. But that's the claim he brings. And the Fifth Circuit explains, when we say you don't look at the allegations in the complaint, we look at the facts, what you're trying to figure is, is this a cause of action for breach of the contract you agreed to arbitrate? And if you just plead it as a tort, that's not the same. But we have done a better job of writing our complaint. We're not saying that the agreement was breached. In fact, in this case, that would be useless to us to say the agreement was breached because that's not part of our claim. The third thing I'd like to say about that is, I think that the decision in this case really does follow from the DuPont and Battaglia cases where you've really emphasized the language of the contract and the importance of clauses that specify the parties that can and cannot benefit from the contract. That case also laid out the factors, and they're saying that among the factors that you consider are alter ego or step in the shoes and also estoppel. But, I mean, I think all of their cases are in the nature of, there's some chance in a million that you can do this. Therefore, this is that case. Okay, this is not, there's not, they have so many of these hoops to jump for. Well, yes, you could have pen and appellate jurisdiction, but it's supposed to be really rare. And, yes, you could bind somebody who's an unsignatory, but it's supposed to be really rare. And, yes, you could bind somebody to equitable estoppel, but it's supposed to be really rare. And if you read the Bureas case, which is the main third circuit case they sat on that, the panel was really hostile to that idea because they had this visceral idea. If we're trying to figure out who agreed to arbitrate a dispute, it's really hard to force somebody to arbitrate something they didn't sign. The last thing I want to say, because it's- I'm going to give you the chance to do that while we're on that point. Does your answering brief respond to your opponent's argument that assuming, even if they have standing and you must arbitrate, that you can only do so on an individualized basis and not on a class basis? Not in great detail. I mean, I think in our view that's an issue either resolved by the- or not in any detail. Well, I think that that's an issue resolved if- go back and you tell the judge he has to order arbitration, the judge can decide that at that time. If not, the arbitration can decide. My view is that that should be taken up by the district judge to decide first who should decide it. Here's my problem. They put that issue before us as one of the issues on appeal. They briefed that issue. I don't see a response in the answering brief to that issue, even if it's the point you're now making. I think that's a fair assessment of the brief. Okay. Why don't you make your final point? I do think that issue is not litigated in the district court. Make your last point now. The last point I want to make, because he spoke about this at great length, there's a deep confusion in their analysis between the two distinct types of liability partnerships. This is a limited liability partnership. The way you get a limited liability partnership is you have a general partnership and then you elect to change it to a limited liability partnership. And so the reason I want to make this point in particular is because Judge Ambrose said he was fond of recitals to agreements. And I think on this point, recitals to this contract, they're just devastating for our side of this. It's on page 363, and it says, I don't know how fond I am. It was drummed into me. It is important it would be in recitals. In this case, it is in recitals. There was a partnership. You can read the statute. They turned on the limited liability, and later on they turned it off. And it's as plain as day, if you read Mr. Griswold's affidavit, that from the entire time that they canceled the limited liability election until the time this complaint was filed, he was still trying to pay taxes and actively working on the financial affairs of the partnership. There was no point in time in which he had paid all the taxes, dealt with everybody who was asking for money, before this complaint was filed. So there's no chance that the partnership was dissolved. If you look at the difference between the relevant agreement about the trust, item 17D, the trust dissolves automatically as soon as the policy is sold, period, in full stop. The partnership, no, the partnership can't do that. The partnership is, when the policy is sold, you need to wind up. And his affidavit, which is his affidavit, and they haven't taken it out of the record, details a list of activities he was engaged in that go so far that you can't take seriously the idea the partnership was terminated. So I think that argument is a red herring that's just off the table. Okay. So let me ask you this question. In order to pull the non-signatory defendants into this suit, you've alleged commentaries that Shell Corporation controlled, dominated, and regularly emptied by defendants Berger, TGC, and Montgomery. Isn't turnabout fair play? Why shouldn't you be bound similarly by the arbitration clause, having treated the defendants as alter egos of the signatory in your own pleadings? Well, one answer would be that they have not alleged or proven that Mr. Berger is an alter ego for the partnership. There's nothing to suggest that the corporate records, the organizational records of this partnership were maintained in such disarray that the partnership wasn't really an entity. There's certainly nothing to suggest that Wells Fargo did such a bad job as trustee that the trust did not have independent existence. You know, there's a trust agreement. Wells Fargo is a trustee. As far as the record would suggest, those entities were maintained with adequate organizational care that you wouldn't say that it was just one entity. And, of course, we haven't proven the alter ego allegations, although they are there. And it's important that, of course, even though we allege those people are alter egos, and so that makes it not so obvious that they are not covered by the arbitration clause. That doesn't say anything about whether we're covered by the arbitration clause. I mean, the fact that they're a closely connected corporate group still doesn't get over the hurdle of who are the people that agreed to arbitrate what disputes. And the people who are in the court never agreed to anything. And the dispute we're talking about, whatever it is, it's not a dispute between the parties. Okay. Thank you very much. Mr. Chairman, go ahead. May I please? The Court has been very generous with its time, and so with the Court's leave, I have just three very quick points on rebuttal. And, of course, I'm happy to answer any questions that the Court might have. First of all, to take these points in reverse order and to start with the issue of class arbitration, I would respectfully submit that it could not be clearer that any argument that plaintiffs are entitled to arbitrate on a class-wide basis has been forfeited. We addressed the issue of class arbitration at length before the district court, and we cite the relevant pages in our opening brief. And, of course, as Judge Ambrose pointed out, we addressed that issue at length before this Court as well. And, nevertheless, plaintiffs offer no response, none in their brief on the issue of whether class arbitration is appropriate here. I would respectfully submit that that is for good reason, because this is not simply a circumstance in which there is nothing in the arbitration provision that suggests a willingness to arbitrate on a class-wide basis. As we note in our brief, both sides to the purchase agreement, both the trustee, Wells Fargo, who has not attempted to commence any litigation but nevertheless submitted a declaration in this case, and Coventry submitted declarations, both of which assert both that the parties did not agree to class arbitration and that the parties did not agree to have an arbitrator make that determination. And so we would respectfully submit that even if this Court were minded to reach the merits of that issue, this is an easy case in which the arbitration provision at most permits individual arbitration. And isn't that really the biggest thing you're concerned about? Well, we're certainly very concerned about that because of the perils of class-wide arbitration. And so at a minimum, if this Court resolves this case in our favor on the arbitration issue, we think that this Court should make clear that on remand the district court should compel arbitration on an individual basis. And again they just And what if it stays in the court? And if the case stays in the court, then presumably plaintiffs would seek class certification, and of course we would oppose that. And we would note at the outset that precisely because the trust is not before the court, this is a case in which you don't even have a class member as the plaintiff. And so we certainly would think that class certification would be inappropriate. Second, on the issue of arbitration here, the one thing that I didn't hear my friend Mr. Mann state was the relevant standard, which is the standard that this Court articulated in Brayman, among other cases. And that is that because of the presumption in favor of arbitration, disputes should be arbitrated as long as the claims touch matters covered by the arbitration provision. What case do you have to say that that presumption obtains when a non-signatory is involved? We recognize that that presumption does not apply to the signatory, non-signatory issue. But of course, Judge Hardiman, it applies with full force with regard to the scope of the arbitration provision and the issue of whether the claims in this case fall within the scope of that provision. So that goes to the what, but it doesn't help you with the who? Well, there are two separate issues on which we have to prevail here. Yeah, it goes to the claims, but it doesn't help you with the who. We have to win on both of those issues for the dispute here to be arbitrated. My point is simply that with regard to the scope of the arbitration provision, that standard and the broad language used by the parties comfortably encompasses the dispute here. Now, with regard to the question of the who, and Judge Ambrose, I want to get back to the issue that you had asked me about, namely, where does this sort of stand-in-the-shoes principle come from, and do we have any cases applying it in the trust context? Well, I don't have a specific case for you, but what I can tell you is that I think this Court has articulated the genesis of that principle. In the DuPont case, the Court said a non-signatory is required to arbitrate if, quote, it is bound under traditional principles of contract law to be akin to a signatory of the underlying agreement. And that is where this principle that a party that seeks to stand in the should be bound really emanates from, the basic principle that you apply ordinary principles of contract law to determine the circumstances under which non-signatories should be bound. And, again, at least in their brief, plaintiffs really don't dispute that that is a valid principle for binding non-signatories, and I don't hear Mr. Mann today to really be suggesting otherwise. He simply suggests that that's not what's going on here with regard to their claims, and I would respectfully submit that that is belied by the verba, that that is what the plaintiffs here are doing, and also by the substantive counts of the complaint. And, finally, let me just say one word on the standing issue. Mr. Mann said at one point that this Court could just leave the standing issue on the table for now and that the Court could decide standing at the end. I think the Supreme Court would be quite surprised to learn that that's the appropriate way to approach issues of standing, the Court that, after all, decided the Steel Company case. The standing issue here is fully developed. This is not a case in which the Court would have to notice the standing issue sua sponte. It was briefed at enormous length before the district court. Didn't I cite the Steel Company case in the Sinechem? You did. And not without force, because I think that there is a little bit of a tension in the Supreme Court's decisions. They conceded there was tension. Yeah. Well, and I think that that really goes to the question of whether this Court has to consider standing first. And our submission is simply that this Court, if it is minded to affirm the district court, does have to consider standing, because otherwise it would be doing precisely what the Supreme Court said that the Court can't do, which is to assume jurisdiction to resolve a substantive question. That is plainly inappropriate, and that is why this Court has not only the authority but the obligation to consider standing at the outset. Thank you very much. Thank you to both counsel for extremely well-presented arguments and also very well-done briefs. We would ask that a transcript be prepared of this oral argument with the sides that split the costs, and you can get together with the clerk's office and have that done. Again, thank you very much for appearing here today.